THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                           :
DEBRA MERRITT,             :    HON. JEROME B. SIMANDLE
                           :
          Plaintiff,       :    CIVIL NO. 06-4963 (JBS)
     v.                    :
                           :    OPINION
JO ANNE B. BARNHART,       :
COMMISSIONER OF            :
SOCIAL SECURITY            :
ADMINISTRATION,            :
                           :
          Defendant.       :
_____:
```

**APPEARANCES:**

Alan H. Polonsky
POLONSKY AND POLONSKY
512 White Horse Pike
Audubon, NJ 08106
     - and -
Robert Savoy, Esquire (Admitted Pro Hac Vice)
Three Neshaminy Complex
Suite 301
Trevose, P.A. 19053
     Attorneys for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Suzanne M. Haynes
          Special Assistant United States Attorney
Office of Social Security Administration General Counsel
26 Federal Plaza
Room 3904
New York, N.Y. 10278
     Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g)

(2006), to review the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying the application of Plaintiff, Debra Merritt ("Mrs. Merritt" or "Claimant"), for disability insurance benefits under Title II of the Act.  Claimant urges this Court to vacate the administrative decision and remand the case to the Commissioner for an award of benefits.

The Court has considered the submissions of the parties pursuant to Local Civil Rule 9.1.  Because the Administrative Law Judge's ("ALJ") decision fails to adequately explain and support her refusal to credit the medical opinion of Claimant's treating physician, fails to adequately consider all of Claimant's ailments, and because the vocational expert used these inadequately reasoned determinations to conclude that Claimant was capable of work available in the national economy, the Court shall remand to the ALJ to reconsider her reasons and provide appropriate explanations.

## I.    BACKGROUND

Mrs. Merritt was born on September 30, 1964, (R. 61), and currently lives in Collingswood N.J., (R. 289).  She is married to her longtime husband Earnest Merritt.  (R. 26.)  She has a high school diploma and nine months tutelage in clerical studies at Lincoln Technical Institute.  (Id.)  She also has three children, two of whom live at home, and one of whom is a Marine stationed in California.  (Id.)

2

## A.  Procedural History

On February 12, 2003, Mrs. Merritt filed an application for disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act.  (R. 61-63.)  On May 21, 2003, Mrs. Merritt completed an Adult Pain Report describing her pain as constantly "[a]ll over - every joint that connects to a muscle . . . [f]ingers, wrists, elbows, shoulders, neck, back, hips, legs, knees, ankles, [and] toes."  (R. 99.)  Mrs. Merritt described the pain as "[d]epends - sometimes all I do is stay in bed with heating pad and sleep[; t]here are many days when I can barely take care of my personal hygiene needs and cannot do anything for my family."  (Id.)  Her application for disability was denied.  (R. 34.)  Mrs. Merritt retained counsel and requested a hearing.  (R. 44.)

In preparation for the hearing, Mrs. Merritt's counsel prepared a Pre-hearing Summary in which he listed her impairments as:

> Degenerative Disc Disease in her low back,
> Herniated Disks in her cervical spine, GERD,
> recurring kidney stones and urinary tract
> infections, recurring headaches, and carpel
> tunnel syndrome in her right arm and hands,
> that limits her use of her right dominant
> hand.  She also suffers from Irritable Bowel
> Syndrome (IBS)as well as Chronic Fatigue
> Syndrome[,] Fibromyalgia . . . anxiety,
> concentration, and short-term memory
> deficits.

(R. 55.)  As a result, Claimant argued through counsel that her

3

impairments met or equaled the "Category of Impairments, Musculoskeletal" at [20 C.F.R. pt. 404, Subpt. P, App. 1, Pt. A, §] 1.05(C) "Disorders of the Spine, Other Vertebrogenic Disorders," and "in addition, [her] impairments equal the listing in [20 C.F.R. pt. 404, Subpt. P, App. 1, Pt. A, §] 14.08N because she has marked restrictions of daily living, difficulties in maintaining social functioning and difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, and pace." (R. 57.)  Realizing that Sections 1.05C and 14.08N pertain to amputation and human immuno-deficiency virus ("HIV") respectively, Claimant's counsel argued that her Fibromyalgia and Chronic Fatigue Syndrome were equivalent impairments entitled to a presumptive ruling of disability. (R. 57-58.)  In sum, Mrs. Merritt argued that she was "unable to perform even limited sedentary work in competitive employment due to . . . numerous impairments." (R. 60.)

On April 15, 2005, Mrs. Merritt presented her case before ALJ Janice C. Volkman.  Evidence produced at the hearing included Mrs. Merritt's voluminous medical file, letters from her children and friends detailing her limited daily activities, (R. 128-38), as well as testimony from Mr. and Mrs. Merritt and a vocational expert, (R. 285-321).

The ALJ's opinion tracked the five-step disability

4

determination process, see 20 C.F.R. § 404.1520(v)-(f) (West 2007), and found Mrs. Merritt was "not disabled" at the fifth step.  At step one, the ALJ noted that Mrs. Merritt had not engaged in substantial gainful activity since the alleged onset date of her disability.  (R. 24.)  In making this determination the ALJ noted that Mrs. Merritt's only work after this date consisted of a "failed work attempt" to return to previous employment and part-time, "as needed" work, in a bakery.  (Id.)

At step two, the ALJ determined that Mrs. Merritt has two severe impairments, Chronic Fatigue Syndrome and a herniated disc of the cervical spine, and four non-severe impairments, depression, Irritable Bowel Syndrome, kidney stones, and a urinary tract infection.  (R. 25-26.)  In so determining, the ALJ considered Dr. Maurer's opinion that Mrs. Merritt was "totally disabled from fibromyalgia and discogenic spine disease, gastroesophageal reflux disease and depression," but gave this opinion "little weight" due to contradictory medical findings "suggest[ing] more moderate limitations."  (R. 25.)  This contradictory medical evidence included Dr. Citta-Pietrolungo's August 10, 2003 evaluation, which found an ability to sit without discomfort, walk without a cane, intact fine coordination, a relatively full range of spinal motion, and noted a proclivity to avoid over-exertion.  (Id.)

At step three, the ALJ found that Mrs. Merritt did not have

5

an impairment or combination of impairments that met or were
equivalent to an impairment in Listings of Impairments, 20 C.F.R.
Part 404, Subpart P, Appendix 1, Regulations No. 4 ("Appendix
One"). (R. 26.) The ALJ provided the following reasoning:

> [h]er spinal impairment does not satisfy the
> requirements of section 1.04 of the Appendix;
> she retains the ability to ambulate
> effectively. Her chronic fatigue syndrome
> does not satisfy the requirements of a
> Listing; no specific Listing corresponds to
> this condition, and the specific findings do
> not establish medical equivalence to a
> Listing.

(Id.)

Based on these findings, the ALJ determined that Mrs.
Merritt's Residual Functional Capacity ("RFC") was "a range of
sedentary work that provides for a sit/stand option." (Id.) The
ALJ substantiated this finding by noting that Dr. Maurer's
opinion was impoverished by its lack of current medical evidence,
his diagnosis of Claimant's fibromyalgia was "by history," and
due to the fact that the ALJ was unsure whether Dr. Maurer has
seen Mrs. Merritt since 2003. (R. 27.)

The ALJ declined to credit the testimony of Mrs. Merritt's
children, friends, and husband, describing a change in Mrs.
Merritt from an active, fun-loving mother and companion to a
sedentary, depressed individual, (R. 128-38, 310-17), and Mrs.
Merritt's own testimony, indicating that she could only sit for
approximately ten minutes at a time, stayed in bed all day most

6

of the week, and had increasing difficulty in concentrating due
to her symptoms, (R. 286-310).  The ALJ reasoned that, although
family, friends, Dr. Maurer, and Mrs. Merritt herself claim that
she is totally unable to work due to pain and fatigue, Mrs.
Merritt's own activity, such as home-schooling her daughter,
driving a car, and on good days "running the house," suggests
otherwise.  (R. 27.)  The ALJ also questioned the authenticity of
the letter-based testimony from Mrs. Maurer's children and
friends, noting that they were unsigned and undated.  (Id.)

At step four, the ALJ determined that Mrs. Merritt was
unable to perform past relevant work.  (R. 28.)  The ALJ based
this finding on testimony from a vocational expert whose opinion
it was that an individual with an RFC of sedentary with sit/stand
option could not perform the work required of a clerk/typist,
sales attendant, and service representative, which were Mrs.
Merritt's past jobs.  (Id.)

At step five, the ALJ determined that there was work
available in the national economy consistent with Mrs. Merritt's
RFC.  (R. 29.)  The ALJ noted that this determination was based
on the vocational expert's response to the question whether
someone with the Claimant's education, experience and sedentary
exertional capacity, with a need to change positions from sitting
to standing every thirty minutes, could hold any job in the
national economy.  (R. 28.)  The vocational expert indicated that

there were several such jobs available, including inspector, assembler, and some types of standing cashiers. (R. 29.) The ALJ further asked the vocational expert whether hypothetically someone with the RFC Dr. Maurer attributed to Mrs. Merritt could perform any job in the national economy. (R. 28-29.) The vocational expert indicated that there were no jobs available in the national economy for such a person. (Id.)

The ALJ did not consider the vocational expert's responses to the following questions posed by Mrs. Merritt's counsel. (Id.)

> Q: . . . If a worker has an inability to stoop, bend at the waist and bend forward, how does that impact the type of jobs that you have listed as assembler, packer, cashier?
>
> A: Well, I believe it first affects [the ALJ's] ruling on that. So I don't want to circumvent that ruling. I'll try answering it by not answering the question and see if you appreciate that.
>
> Q: Oh, I'll appreciate that.
>
> A: The three jobs that I listed you have to have the ability to bend forward at the waist while seated, and not hunched over the work space but you can't be leaning back. The work isn't done that way. So that is the issue we're talking about more than stooping, bending, or squatting. It's the inability to do that that would impact the ability to work.
>
> Q: Okay. And do, these, let's take a claimant who, hypothetically like the claimant that we have here today, but has a carpal tunnel situation that precludes a

certain amount of gripping and holding, and
any type of repetitive motion with the right
hand, the right dominant hand.  How would
that affect the assembler, and inspector, and
cashier positions?

A: It would probably preclude the inspector
and the assembler.  I'm not so sure about the
cashier just because of the type of place
being a cashier.

. . .

Q: Now do you know any employer who would
allow a break to allow the worker to lie down
on a heating pad, or to take a hot soaking
bath?

A: I'm looking for that one.

Q: I'm looking for that too.

(R. 319-21.)  The ALJ discounted this testimony by reasoning that

the medical records "present no evidence of an inability to stoop

. . . [and] presents no formal diagnosis of carpal tunnel

syndrome."  (R. 29.)  The ALJ held that the Commissioner had met

its burden of persuading the administrative court that Mrs.

Merritt could make a successful transition within the national

work-force and therefore ruled that Mrs. Merritt was "not

disabled."  (R. 30.)

     On October 28, 2005, Mrs. Merritt requested a review of her

administrative hearing.  (R. 39.)  She did not file her request

on time; however, the Social Security Administration determined

that there was good reason for the delay and reviewed the

decision on the merits.  (R. 4.)  The Administration ruled

against the Claimant, reasoning that there was no abuse of discretion, no error of law, no broad policy affecting the public, no new evidence, and that the decision was supported by substantial evidence. (Id.) As a result, the ALJ's decision became the final determination of the Commissioner and Mrs. Merritt filed this appeal.

### B. Recent Work History

From August 1990 until November 2000, Mrs. Merritt worked for the Department of Corrections, ascending to the position of Secretary to the Chief of Staff, where she was responsible for hiring some new employees. (R. 293.) During that time, Mrs. Merritt took two leaves of absence due to fibromyalgia.[1] (R. 293-94.) The first started in November of 1997 and continued until February of 1998. (Id.) The second began in August of 2000 and lasted until November of that year when the Department of Corrections informed Mrs. Merritt that she needed to return to work or cease her employment with them. (Id.) Mrs. Merritt did not return to the Department of Corrections. (Id.)

From March to July of 2001, Mrs. Merritt worked at K-Mart as a cashier. (R. 141.) Beginning in July of 2001, Mrs. Merritt

---

[1] Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as axial distribution . . . additionally there must be point tenderness in at least eleven of eighteen specified sites." Stedman's Medical Dictionary (27th ed. 2000).

began working at Kelly Temporary Services, performing clerical work on an intermittent basis.  (R. 292.)  In February 2002, Mrs. Merritt acquired a job with Comcast answering phones, helping with technical problems, and paying bills.  (R. 290.)  Mrs. Merritt took disability leave at Comcast in July of 2002 for two months, and then returned.  (R. 290-91.)  In January of 2003, Mrs. Merritt took disability leave yet again, this time for six months.  (R. 291-92.)  Soon thereafter, Comcast ended the employment relationship.  (R. 291.)  During her time at Comcast, Mrs. Merritt worked contemporaneously at a bakery as a receptionist when the full-time receptionist could not work.  (R. 291-92.)

### C.  Recent Medical History

The Mount Holly Family Practice ("Mount Holly") acquired Mrs. Merritt as a patient on May 18, 1998.  (R. 185.)  Many physicians at Mount Holly examined and treated Mrs. Merritt.  (R. 148-91.)  The legible portions of the notes of doctors Bove, Smith, Chatyrka, and Grovatt reveal that Mount Holly physicians primarily treated Mrs. Merritt for fibromyalgia, beginning on her initial visit in May of 1998.  (Id.)  The physicians at Mount Holly also treated Mrs. Merritt for depression, Chronic Fatigue Syndrome, migraines, urinary tract infections, and lower back pain.  (Id.)  There are no patient notes in the record from Mount Holly for Mrs. Merritt past June 13, 2003.

Larchmont Imaging Associates ("Larchmont") conducted most of Mrs. Merritt's imaging on referral from Mount Holly.  (R. 192-202.)  On August 24, 2000, Larchmont examined Mrs. Merritt's lumbosacral spine.  (R. 198.)  Dr. Kevin P. Barry concluded that Mrs. Merritt was suffering from mild disc-space narrowing and spondylolisthesis.[2]  (Id.)  On August 30, 2000, Larchmont conducted magnetic resonance imaging ("MRI") without contrast of Mrs. Merritt's lumbar spine.  (R. 197.)  Dr. Barry found mild degenerative disc disease and grade I spondylolisthesis.  Dr. Barry found no evident disc herniation.  (Id.)

On May 12, 2003, however, Larchmont performed another MRI on Mrs. Merritt.  (R. 192.)  The report of Dr. Sungtae Lim noted a "left paracentral disc herniation contacting the anterior margin of the spinal cord" as well as a "broad-based shallow left paracentral disc herniation" also contacting the anterior margin of the spinal cord.  (Id.)  Dr. Lim further noted that Mrs. Merritt has a clinical history of radiculopathy.[3]  (Id.)

Mrs. Merritt saw Dr. Dianne Di Lee of South Jersey Neurocare for her headaches in April and May of 2003.  (R. 213-17.)  Dr. Lee noted that Mrs. Merritt complained of two types of headaches,

---

[2]  Spondylolisthesis is "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum."  Stedman's Medical Dictionary, supra.

[3]  Radiculopathy is defined as "any disorder of the spinal nerve roots."  Stedman's.

"fuzzy" and "thumping." (R. 215.) Dr. Lee attributed those headaches, at least in part, to right cervical and left lumbar radiculopathies at multi-levels. (R. 213-14.) Further, Dr. Lee noted that a nerve conduction study completed on April 29, 2003 showed that Mrs. Merritt suffers from "mild" Carpal Tunnel Syndrome. (R. 213.)

Mrs. Merritt first saw Dr. Kenneth H. Maurer of Arthritis, Rheumatic & Back Disease Associates, P.A. on October 10, 2000 for a rheumatological evaluation and consultation on referral from Mount Holly. (R. 267.) Dr. Maurer noted that Mrs. Merritt was previously diagnosed with fibromyalgia by Dr. Schlessel, a rheumatologist at Rancocas Valley Hospital. (Id.) Dr. Maurer concurred with Dr. Schlessel's diagnosis of fibromyalgia, noting that Mrs. Merritt's is a "classical" case.[4] (R. 268.)

Mrs. Merritt again saw Dr. Maurer on January 4, 2001. (211). He noted that Mrs. Merritt's "biggest complaint today [had] to do with generalized fatigue." (Id.) He started Mrs. Merritt on an aerobic fitness program with walking. (Id.) Dr. Maurer examined Mrs. Merritt again on March 14, 2001 and noted that she was "generally somewhat improved as far as her overall condition." (R. 210.) He indicated that Mrs. Merritt was

---

[4] Although in his report to the Department of Labor, Division of Disability, Dr. Maurer indicated that he began seeing Mrs. Merritt in September of 2002, this must be a typographical error because the record indicates that he first examined her on October 13, 2000. (R. 267.)

experiencing "less myalgias and arthralgias,"[5] noting that "rest periods during the day in a semi-Trendelenburg position[6] with the use of heat have helped her a great deal."  (Id.)

Eighteen months passed before Dr. Maurer's next evaluation of Mrs. Merritt on August 19, 2002.  (R. 208.)  Dr. Maurer noted in this evaluation that Mrs. Merritt was still "somewhat depressed" and had "multiple trigger points" with a lower range of motion in the lower back.  (Id.)  The record does not contain records of any other visits.  However, in Mrs. Merritt's testimony before the ALJ on April 5, 2005, she claimed that she continues to visit Dr. Maurer regularly, at least once every three months.  (R. 296.)

On August 4, 2003, Dr. Maurer submitted a report to the Department of Labor, Division of Disability, summarizing Mrs. Merritt's medical history.  (R. 231-32.)  He noted finding "multiple trigger points involving the cervical spine, the shoulders, the elbows, the hip area and the knee area."  (R. 232.)  He indicated that Mrs. Merritt's "back movement was reduced with a shoulder maneuver of less than 1 cm" and that a "[s]traight leg raising test was positive to the low back."

---

[5]  Myalgia is muscular pain.  Arthralgia is "pain in the joint, especially one not inflammatory in character."  Stedman's.

[6]  The Trendelenburg Position is "[s]upine on the operating table, which is inclined at varying angles so that the pelvis is higher than the head . . . ."  Stedman's.

(Id.)  He noted that Mrs. Merritt's condition had not improved under his care, and that he continued to observe multiple areas of trigger points and decreased range of motion in the cervical and lumbar spine.  (Id.)  Finally, he noted that Mrs. Merritt "continues to be totally disabled from a combination of fibromyalgia and discogenic spine disease, gastroesophageal reflux disease and depression."  (Id.)

On September 9, 2004, Dr. Maurer completed a Treating Physician's Opinion Questionnaire (the "Questionnaire") regarding Mrs. Merritt's medical condition.  (R. 273-82.)  In response to the question "[n]ature, frequency, and length of contact," Dr. Maurer indicated that Claimant had been his patient since October 2000.  (R. 273.)  He noted that Mrs. Merritt met the American College of Rheumatology criteria for Fibromyalgia and the Center for Disease Control's criteria for Chronic Fatigue Syndrome. (Id.)  He noted that the earliest date to which his description of symptoms and limitations applies is "[b]y history 1997." (Id.)

Dr. Maurer explained the way in which he diagnosed Mrs. Merritt's condition by indicating that Mrs. Merritt has the "signs, symptoms, or diagnoses" of among other things, "multiple tender points," "chronic fatigue," "numbness and tingling", "depression", and "carpal tunnel syndrome."  (R. 274.)  He listed "trigger points" and "persistent reproducible muscle tenderness

15

on repeated examinations, including the presence of positive tender points" as "medical sign[s]" that have been "clinically documented for a period of at least six consecutive months."  (R. 275.)  He also cited a "photo of medical imaging" as a "laboratory finding[] consistent with medically accepted clinical practice" that is "consistent with other evidence in the case record."  (Id.)  In response to a question concerning the expected duration of impairments, Dr. Maurer noted that Ms. Merritt's impairments can be expected to last more than twelve months, and that she is not a malingerer.  (R. 276.)

Dr. Maurer also provided an analysis of Mrs. Merritt's physical capabilities, characterizing Mrs. Merritt's functional limitations as (1) "moderate" restrictions on activities of daily living, (2) "marked" difficulty in maintaining social functioning, (3) "constant" difficulty in maintaining concentration, persistence, or pace, and (4) "four or more" repeated episodes of decompensation,[7] each of extended duration. (R. 277.)  Dr. Maurer noted that Mrs. Merritt could "occasionally" twist or stoop and "rarely" crouch, climb stairs, or climb ladders.  (R. 279.)  He further noted that Mrs. Merritt's reaching and handling are not affected by her impairments, but that her fingering, feeling and pushing/pulling

---

[7]  Decompensation is "the appearance or exacerbation of a mental disorder due to failure of defense mechanisms." Stedman's.

16

were affected by "numbness in right arm down to and including fingers caus[ing] patient to not be able to write, type, etc. for any period of time."  (R. 279.)

Dr. Maurer further offered an analysis of Mrs. Merritt's experience of pain, noting "moderate to severe pain" on both sides of patient's lumbosacral spine, cervical spine, shoulders, hips, and legs, "precipitated by stress, movement/overuse, fatigue, cold, and changing weather."  (R. 278.)  Dr. Maurer noted that Mrs. Merritt's experience of fatigue and/or other symptoms were "constantly" severe enough to interfere with attention and concentration needed to perform even simple tasks. (R. 277.)

In terms of Mrs. Merritt's ability to work, Dr. Maurer found that she is "[incapable of even 'low stress'" were she to be placed in a "competitive work environment."  (R. 279.)  Dr. Maurer observed that Mrs. Merritt could continuously sit for fifteen minutes and continuously stand for five minutes, and that she would need to shift these positions "at will."  (R. 280.)  He also indicated that Mrs. Merritt would need to take unscheduled breaks of at least thirty minutes during which time she would need to lie down, nap, or sit quietly, and that while working she would have to sit with her legs elevated "even with hips" for all eight hours of the working day.  (R. 281.)  Finally, Dr. Maurer noted that Mrs. Merritt would likely be absent from work "more

than four times a month" as a result of her impairment or treatments.  (R. 282.)

During Mrs. Merritt's disability application process, Dr. C.J. Citta-Pietrolungo, a state medical examiner, conducted a consultative examination of her condition.  Her report to the New Jersey Department of Labor, Division of Disability on August 10, 2003 indicated that Mrs. Merritt has fibromyalgia, chronic fatigue syndrome, depression, and a history of low back strain and migraine headaches.  (R. 236.)  She noted that her functional examination of Mrs. Merritt revealed an ability to walk independently "without asissitive device," "sit without discomfort," and "make[] transitions slowly."  (Id.)  She further reported that Mrs. Merritt's "grasp, manipulation, pinch, [and] fine coordination [are] intact," and that her functional skills are independent.  (Id.)  She also indicated that her physical examination of Mrs. Merritt revealed a full range of neck, arm, legs, lumbar spine (side and forward bending) motion, as well as a cervical spine range of motion "within normal limits."  (R. 235.)  Dr. Citta-Pietrolungo found no Babinski sign[8] and a negative Romberg sign.[9]  (R. 236.)  Overall, Dr. Citta-Pietrolungo

_____

[8]  The Babinski Sign is "an extension of the great toe and abduction of the other toes instead of normal flexion reflex to plantar stimulation, considered indicative of pyramdial tract involvement."  Stedman's.

[9]  The Romberg Sign is "with feet approximated, the subject stands with eyes open and then closed; if closing the eyes

indicated that "[c]linical examination is significant for avoiding over-exertional activities due to lack of effort; [t]he claimant may be suffering from the effects of limited exertional effort and perhaps some effects of prolonged bedrest." (Id.)

On August 20, 2003, Dr. Schneider, a state reviewing physician, reviewed Mrs. Merritt's medical records and completed a Physical Residual Functional Capacity Assessment. (R. 245.) In his assessment, Dr. Schneider noted, among other things, that Mrs. Merritt can stand at least two hours and sit for a total of about six hours in an eight hour workday, as well as push and/or pull to an unlimited degree. (R. 246.) Dr. Schneider based this assessment on Mrs. Merritt's history of Chronic Fatigue Syndrome, fibromyalgia, cervical disc disease with radiculopathy, migraine headaches, symptomatic gastroesophageal reflux disease ("GERD"), and orthopedic abnormalities. (R. 246-47.) He emphasized the fact that Mrs. Merritt "avoids exertion . . . [h]owever, at times [she] alleges intensification of her symptoms which virtually confines her to bed." (Id.) Dr. Schneider found no manipulative limitations, no visual limitations, and no communicative limitations. (R. 248-49.) He noted that his assessment is different from the assessment of Dr. Maurer, citing the treating physician's failure to indicate "very specific limitations such

---

increases the unsteadiness, a loss of perceptive control is indicated, and the sign is positive." Stedman's.

as lift, carry, reach, sit or ambulate," as the reason for the discrepancy.  (R. 251.)

On August 11, 2003, Kenneth Goldberg, Ph.D., apparently a psychologist, examined Mrs. Merritt's mental status.  (R. 241-44.)  Dr. Goldberg noted that "claimant reports some depression and anxiety, but symptoms are not described in any great severity and are secondary to a state of chronic fatigue."  (R. 244.)  He emphasized his opinion that Mrs. Merritt's psychological difficulties were caused by and inseparable from her physical conditions of fibromyalgia and chronic fatigue, stating that "I can detect no psychiatric roots behind her condition."  (Id.)  Dr. Goldberg articulated a "guarded" prognosis "without clear prospects for recovery."  (Id.)

## II.  DISCUSSION

### A.   Disability Defined

The Social Security Act defines "disability" for purposes of a claimant's entitlement to benefits as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled

> only if [her] physical or mental impairment
> or impairments are of such severity that

> [she] is not only unable to do [her] previous
> work but cannot, considering [her] age,
> education, and work experience, engage in any
> other kind of substantial gainful work which
> exists in the national economy, regardless of
> whether such work exists in the immediate
> area in which [she] lives, or whether a
> specific job vacancy exists for [her], or
> whether [she] would be hired if [she] applied
> for work.

§ 1382(a)(3)(B).

The Commissioner has promulgated regulations that determine
disability by application of a five-step sequential analysis
codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates
each case step-by-step until a finding of "disabled" or "not
disabled" is obtained.  20 C.F.R. § 404.1520(a).  This five-step
process is summarized as follows:

> 1.  If the claimant currently is engaged in
> substantial gainful employment, he will be
> found "not disabled."
>
> 2.  If the claimant does not suffer from a
> "severe impairment," he will be found "not
> disabled."
>
> 3.  If the severe impairment meets or equals
> a listed impairment in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 and has lasted or is
> expected to last for a continuous period of
> at least twelve months, the claimant will be
> found "disabled."
>
> 4.  If the claimant can still perform work he
> has done in the past ("past relevant work")
> despite the severe impairment, he will be
> found "not disabled."
>
> 5. Finally, the Commissioner will consider
> the claimant's ability to perform work
> ("residual functional capacity"), age,

21

> education and past work experience to
> determine whether or not he is capable or
> performing other work which exist in the
> national economy.  If he is incapable, a
> finding of disability will be entered.  On
> the other hand, if the claimant can perform
> other work, he will be found not to be
> disabled.

§ 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  <u>Wallace v. Sec'y. of Health and Human Servs.</u>, 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the claimant.  <u>Kangas v. Bowen</u>, 823 F.2d 775, 777 (3d Cir. 1987); <u>see</u> <u>Olsen v. Schweiker</u>, 703 F.2d 751, 753 (3d Cir. 1983).

### B.  Standard of Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 507 U.S. 924 (1993).  "Substantial evidence" means more than a "mere scintilla."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal quotations omitted).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Id.</u>  The inquiry is not whether the reviewing court

22

would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be slightly less than a preponderance.  See Hanusiewicz v. Bowen, 678 F. Supp. 474, 476 (D.N.J. 1988).

Some types of evidence will not be "substantial."  For example,

> a single piece of evidence will not satisfy
> the substantiality test if the [Commissioner]
> ignores, or fails to resolve, a conflict
> created by countervailing evidence.  Nor is
> evidence substantial if it is overwhelmed by
> other evidence - particularly certain types
> of evidence (e.g. that offered by treating
> physicians) - or if it really constitutes not
> evidence but mere conclusion.

Wallace, 722 F.2d at 1153 (internal citations omitted).

The reviewing court, however, does have a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  To do so, "a court must take into account whatever in the record fairly detracts from its weight." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal quotations omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "Where the [Commissioner] is faced with conflicting evidence, [the Commissioner] must adequately explain in the record the reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (internal citations

omitted).  As the Third Circuit has held, access to the
Commissioner's reasoning is indeed essential to a meaningful
court review:

> [u]nless the Commissioner has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

### C.   Analysis

#### 1.   The ALJ's Decision Not to Credit the Testimony of Claimant's Treating Physician is Not Supported by Substantial Evidence

The ALJ attributed minimal weight to the medical opinion of
Mrs. Merritt's treating rheumatologist, Dr. Maurer, by reasoning
that (1) "his opinion on disability is unsupported by the medical
findings which suggest more moderate limitations," (2) "[t]he
Questionnaire from Dr. Maurer qualifies the disability finding
with the phrase 'by history,' rather than having a basis in
objective findings," (3) there is a "paucity of current medical
records given the severity of the limitations alleged," and (4)
"it is unclear if Dr. Maurer has seen the claimant since December
2003."  (R. 25-27.)  Claimant argues that the ALJ's failure to
credit Mrs. Merritt's treating rheumatologist, Dr. Maurer, is
reversible error because the ALJ's reasoning is not supported by

the factual record and because the ALJ neglected to fully develop the record, basing her opinions instead on critical information she characterized as "unclear," instead of using the record to understand these discrepancies.  (Pl.'s Br. at 4-6.)  The Commissioner argues that the ALJ properly refused to give Dr. Maurer's testimony controlling weight because his medical opinions are unsupported by medical diagnostic techniques and are contradicted by the medical opinion of consultative reviewer, Dr. Citta-Pietrolungo. (Def.'s Br. at 13-19.)

A treating physician's medical opinion will be given controlling weight when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  Otherwise, the credibility of non-controlling medical evidence is evaluated by considering: (1) length of relationship and frequency of examination, (2) nature and extent of treatment relationship, (3) supportability of opinion in terms of the prevalence of medical signs and laboratory findings, (4) consistency with other medical evidence, (5) specialization of medical source, (6) other factors to include familiarity with the disability standards and procedures.  § 416.927(d)(1)-(6).  Indeed, the opinion of a treating physician is entitled to more weight than a one-time consultative examiner because treating physicians

> are likely to be the medical professionals
> most able to provide a detailed, longitudinal
> picture of [a Claimant's] medical
> impairment(s) and may bring a unique
> perspective to the medical evidence that
> cannot be obtained from the objective medical
> findings alone or from reports of individual
> examinations, such as consultative
> examinations or brief hospitalizations.

§ 404.1527(d)(2); see Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994). This is particularly true "when the opinion reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987) (internal quotations omitted). Moreover, an ALJ can only reject the opinion of a treating physician if the ALJ explains on the record the reasons for doing so, see Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989), and the ALJ must indicate the basis for conclusions that a doctor's report is not credible, Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981).

The ALJ determined that treating physician Dr. Maurer's testimony is not due "significant weight." (R. 27.) This Court is not convinced, however, that the ALJ conducted the required analysis. First, this Court is unconvinced that the ALJ properly considered the supportability of Dr. Maurer's opinion in terms of the prevalence of medical signs and laboratory findings in the difficult diagnostic environment of fibromyalgia. The ALJ notes that Dr. Maurer's opinion is "unsupported by the medical findings

26

. . . ." (R. 25.) Medical signs are "anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] statements" and which "must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 416.928(b). Likewise, laboratory findings are "anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques [sic]." § 416.928(C).

In addition, fibromyalgia is a peculiar disease which does not lend itself to easy diagnosis, see Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 44-45 (2d Cir. 1991), which is diagnosed by ruling out other disease through medical testing, id., and is notorious for producing consistently normal neurological findings upon examination, see Preston v. Sec'y of Heath & Human Servs., 854 F.2d 815, 817-18 (6th Cir. 1988) (noting that "[i]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results - - a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions").

Although the ALJ discounts Dr. Maurer's testimony by reasoning that it is unsupported by medical findings, this is simply inaccurate. Dr. Maurer's letters to Mount Holly, as well as the Questionnaire, all indicate that Dr. Maurer's opinion is

27

based on medical signs such as multiple tender points and
negative performance on straight leg lifting tests, and is based
on the laboratory findings of Larchmont imaging.  The record
indicates that Dr. Maurer did consider medical signs and
laboratory tests, to the extent such signs and tests were
available, and therefore, according to the Commissioner's
regulations, his findings as to the treating physician were
entitled to significant weight.

In addition, the ALJ appears to have misread the
Questionnaire submitted by Dr. Maurer.  On that form, Dr. Maurer
was asked "what is the earliest date that the description of
symptoms and limitations in this Questionnaire applies."  He
responded "by history, 1997" because he did not begin treating
Claimant at the onset of her impairment.  Of course he can not
personally vouch for any analysis of Claimant's medical condition
antecedent to his first examination of her in the year 2000.  He
first saw Mrs. Merritt upon referral from Mount Holly, where she
had been treated for fibromyalgia since 1998, on October 10,
2000; her disability status predated that visit, or he would have
arrived at a different disability onset date.  Further, the
record shows his continuing treatment and diagnosis of Claimant
were based on medical tests and examinations, not simply Mrs.
Merritt's self report or the self-reported opinion of previous
physicians, and his diagnosis should not have been discredited on

that basis.  Moreover, Dr. Maurer was able to confirm the earlier diagnosis of fibromyalgia by Dr. Schlessel, the rheumatologist at Rancocas Valley Hospital.

The Commissioner argues through analogy to the district court decisions of Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996) and Fisher v. Sec'y of Health and Human Servs., 818 F. Supp. 88, 90 (D. Del. 1993), that the ALJ appropriately gave greater weight to the opinion of the consultative examiner than to the treating physician.  These cases do not compare to this one.  While this Court accepts the general proposition that a consultative examiner's opinion can, in some circumstances, be given greater weight than that of a treating physician, both cases cited by the Commissioner give greater weight to the medical opinion of a consulting examiner than that of a treating chiropractor. Chiropractors are not analogous with rheumatologists because chiropractors, unlike rheumatologists, are not "medical sources." See 20 C.F.R. § 220.46.

In sum, on remand, the ALJ must reconsider and explain her decision to discredit Dr. Maurer's testimony, or to credit it, in light of all the record evidence.  The ALJ's decision to discredit Dr. Maurer's testimony is not supported by substantial evidence because the reasons she gives to support her decision are (1) not supported by the facts in the record, (2) do not

reasonably support her conclusions, and (3) simply do not explain why Dr. Citta-Pietrolungo's medical opinion supercedes the substantial weight normally given to treating physicians, such as Dr. Maurer, especially within the treating physicians's area of special expertise, here, rheumatology.

    2.   The ALJ Failed to Consider All Medically Determinable Impairments

The ALJ found that Mrs. Merritt suffered from two severe impairments, namely Chronic Fatigue Syndrome and a herniated disc, and four non-severe impairments, namely depression, Irritable Bowel Syndrome, kidney stones, and a urinary tract infection. (R. 25.) Although the ALJ discussed Mrs. Merritt's fibromyalgia, she failed to list this ailment as an impairment. The ALJ also failed to list carpal tunnel syndrome, noting that the record contains "no formal diagnosis" of that condition. (R. 29.) Finally, the ALJ simply did not discuss Claimant's radiculopathy and lumbar disc disease. The Claimant argues that this demonstrates that the ALJ failed to consider all medically determinable impairments, and that this failure resulted in the formulation of an inaccurate RFC, which in turn, resulted in the inaccurate finding that Mrs. Merritt could perform work in the national economy. (Pl.'s Br. at 2.) The Commissioner argues that the ALJ considered these ailments through her review of all the medical reports of record and determined that they did not rise to the level of an impairment limiting her ability to work.

The existence of non-severe impairments does not compel a ruling of "disabled."  The existence of non-severe impairments is significant, however, in the ALJ's residual function capacity assessment ("RFC"), which determines "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  S.S.R. 96-8p, 1996 WL 374184 at *1.  The ALJ determines a patient's RFC by evaluating "all of the relevant evidence in the case record" and "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'."  Id. at *5.  Indeed, non-severe limitations, when considered in combination with a patient's other severe limitations, may be "critical to the outcome of the claim."  Id.

In turn, the RFC is significant because the ALJ uses it at steps four and five to determine whether an individual with such an RFC is capable of prior work or work available in the national economy.  As a result, this Court must determine whether the ALJ considered Mrs. Merritt's evidence of fibromyalgia, radiculopathy, lumbar disc disease, and carpal tunnel syndrome in making the determination that Mrs. Merritt has an RFC of sedentary with sit/stand option, and therefore can perform work available in the national economy.

### i.   Fibromyalgia

The ALJ did not list fibromyalgia as one of Mrs. Merritt's

31

impairments.  Claimant argues that this indicates that the ALJ
failed to even consider Mrs. Merritt's fibromyalgia when
determining her RFC.  (Pl.'s Br. at 2-3.)  Indeed, an ALJ must
provide reasoning for her findings such that courts can provide
meaningful review under a substantial evidence standard.  Jones
v. Barnhart, 364 F.3d 501, 504-05 (3d Cir. 2004).  However, that
reasoning does not have to "adhere to a particular format" and is
only required to "ensure that there is sufficient development of
the record and explanation of findings to permit meaningful
review."  Id.

     At the outset, this Court notes that the ALJ's failure to
list fibromyalgia as at least a non-severe impairment - along
with impairments the ALJ did list, such as kidney stones,
irritable bowel syndrome, depression, and a urinary tract
infection - is curious.  Indeed, a non-severe impairment is
simply "an impairment that does not significantly limit [a
patient's] physical or mental ability to do basic work
activities," and the medical evidence in the record strongly
supports the conclusion that Mrs. Merritt's fibromyalgia rises to
at least the same level as a urinary tract infection or kidney
stone.  See, e.g., (R. 274) (noting fibromyalgia, diagnosed
through observation of multiple trigger points, responsible for
fatigue and pain constantly severe enough to interfere with
simple tasks).  However, despite the ALJ's failure to label Mrs.

32

Merritt's fibromyalgia as a named impairment, her opinion does indicate that she considered Mrs. Merritt's fibromyalgia in formulating the RFC.  The ALJ discussed Mrs. Merritt's fibromyalgia during her treatment of (1) Mrs. Merritt's allegations of pain and inability to work, (R. 27), (2) Dr. Maurer's opinion that Mrs. Merritt is "totally disabled," (R. 25), and (3) Dr. Citta-Pietrolungo's contradictory opinion that Mrs. Merritt can sit without pain, has a normal range of motion, and simply avoids over-exertion, (R. 25).  In so discussing Mrs. Merritt's fibromyalgia, the ALJ came to the conclusion that Mrs. Merritt's fibromyalgia, in concert with her other impairments, left her with the ability to work in a sedentary capacity with a sit/stand option.  (R. 26.)  The ALJ was clear that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms[;] however, the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible."  (R. 27.)  In sum, the ALJ properly considered Mrs. Merritt's fibromyalgia, despite failing to list it as even a non-severe impairment.[10]

---

[10]  Of course this does not necessarily mean that on remand the ALJ's consideration of Mrs. Merritt's fibromyalgia must remain the same.  Indeed, if after reconsidering her reasons for failing to credit Dr. Maurer's testimony the ALJ's assignment of weight changes, then the ALJ's consideration of Claimant's fibromyalgia will likely also change because the ALJ's estimation of the severity of Mrs. Merritt's fibromyalgia was linked to her

ii.  **Carpal Tunnel Syndrome**

The ALJ failed to consider Claimant's Carpal Tunnel Syndrome beyond observing that there is no "official diagnosis" of this affliction.  (R. 29.)  Claimant argues that this constitutes a failure to consider a medically determinable impairment in determining her RFC.  (Pl.'s Br. at 3.)  Although Dr. Lee characterizes it as "mild," she diagnosed Mrs. Merritt with Carpal Tunnel Syndrome on April 29, 2003 and noted this condition again one month later.  (R. 150, 213.)  The ALJ apparently overlooked these records when developing Claimant's RFC.  The ALJ's failure to consider Claimant's Carpal Tunnel Syndrome is significant because the vocational expert offered testimony that someone with tactile impairments consistent with Carpal Tunnel Syndrome might not be able to perform the jobs the ALJ ultimately found were available to an individual of Mrs. Merritt's RFC. This must also be addressed upon remand.

iii.  **Radiculopathy and Degenerative Disc Disease**

The ALJ never addressed Claimant's radiculopathy and degenerative disc disease despite the fact that the Claimant specifically referenced Degenerative disc disease as one of her impairments in her Pre-hearing Summary, (R. 55), and Mrs. Merritt's diagnosis of radiculopathy is noted by numerous doctors

_____

determination that Dr. Maurer's testimony demanded little weight.

in the medical record, (e.g., R. 213) (indicating diagnosis of radiculopathy discovered through "EMG and nerve conduction study on April 29, 2003"). As noted supra, the ALJ must provide this Court with sufficient explanation of her decision to provide meaningful review. Jones, 364 F.3d at 504-05. Although the ALJ discussed and evaluated symptoms, such as back pain and spinal mobility, (R. 25-26), that would seem to indicate she considered radiculopathy and degenerative disc disease as symptomary root causes, this Court is not satisfied that the ALJ considered Claimant's radiculopathy and degenerative disc disease because of her failure to even mention these ailments, and this condition must also be addressed upon remand.

   3.   The ALJ Provided Sufficient Discussion of Her Step
        Three Analysis to Provide This Court with Adequate
        Means to Determine That Her Finding was Based on
        Substantial Evidence

Claimant argues that the ALJ did not adequately explain her finding at step three, namely that Mrs. Merritt did not suffer from an impairment equivalent to or listed in Appendix One. (Pl.'s Br. at 3.) Specifically, Claimant contends that Mrs. Merritt's impairments equal the (1) musculo-skeletal impairment at Section 1.05(C) due to significant motor and spine motion loss, (2) immune system impairment at Section 14.08(N) due to "marked restrictions of daily living" allegedly attributable to Mrs. Merritt's fibromyalgia, and (3) other mental health listings in "Section 12." (R. 57-58.) Claimant concludes that the ALJ's

35

cursory rejection of the alleged equivalency constitutes reversible error.  (Pl.'s Br. at 4.)  The Commissioner argues that, although the ALJ's particular step three explanation is sparse, when read as a whole the ALJ's explanation is sufficient. (Def.'s Br. at 11.)

As noted <u>supra</u>, an ALJ must provide reasoning for her findings such that this Court can provide meaningful review under a substantial evidence standard.  <u>Jones</u>, 364 F.3d at 504-05.  The only part of the ALJ's opinion that specifically addresses step three is:

> [h]er spinal impairment does not satisfy section 1.04 of the Appendix: she retains the ability to ambulate effectively.  Her chronic fatigue syndrome does not satisfy the requirements of a Listing: no specific Listing corresponds to this condition, and the specific findings do not establish medical equivalence to a Listing.

(R. 26.)  However, elsewhere in the opinion, the ALJ adequately developed the record sufficiently to allow this Court to determine that her step three determination was based on substantial evidence.

For example, the ALJ's written opinion makes clear that she considered Mrs. Merritt's impairments for equivalency to musculo-skeletal impairments listed in Appendix One.  To qualify for presumptive disability at step three due to musculo-skeletal impairment, a patient must display an "inability to ambulate effectively on a sustained basis for any reason."  20 C.F.R. Pt.

404, Subpt. P, App. 1 Pt. A § 1.0B2a.  Effective ambulation is
"an extreme limitation of the ability to walk."  § 1.0B2b(1)(2).
Throughout the opinion, the ALJ discussed consulting examiner Dr.
Citta-Pietrolungo's report and specifically recounted her medical
findings that Claimant has a relatively good range of spinal
motion, can walk without a cane, and can sit without pain.  (R.
25.)  Indeed, Dr. Maurer's opinion does not indicate that Mrs.
Merritt has any ambulatory limitations that would rise to the
level of "extreme."  Thus, the ALJ sufficiently explained her
decision and there is substantial evidence to support the
conclusion that Mrs. Merritt's spinal impairments do not reach
the severity of a Section 1.04 listing because Mrs. Merritt can
ambulate effectively, as defined by Appendix One.

        Additionally, it is clear that the ALJ considered Mrs.
Merritt's impairments for equivalency to immune system
impairments listed in Section 14 of Appendix One.  Section
14.08(N) lists an impairment due to HIV as one that results in a
"marked . . . restriction of activities of daily living."  20
C.F.R. pt. 404, Subpt. P, App. 1, Pt. A at § 14.08N.  A "marked
restriction" of daily living activities is one that "seriously
interfere[s] with the [patient's] ability to function
independently, appropriately, and effectively."  § 14.00D8.  In
her opinion, the ALJ found that Mrs. Merritt was functionally
independent in household chores, emphasizing Dr. Citta-

37

Pietrolungo's evaluation, (R. 25), and the Claimant's testimony that she home-schooled her child and drove her car, (R. 26-27). Again, Dr. Maurer did not indicate any limitations that would rise to the level of an equivalency with a Section 14 listing. Thus, there is substantial evidence supporting the ALJ's finding that Mrs. Merritt's Chronic Fatigue Syndrome did not rise to the level of a listing under Section 14 because the ALJ clearly found that Mrs. Merritt's ability to function effectively and independently is not seriously affected by that impairment.[11]

Finally, it is clear that the ALJ considered Mrs. Merritt's impairments for equivalency to listed mental impairments and that substantial evidence supports the ALJ's determination that Claimant's mental impairments are not equivalent to any listed impairment.  Section 12 lists mental impairments that establish disability and requires that they be "incompatible with the ability to do any gainful activity."  20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12A.  Although the ALJ's step three explanation does not specifically mention Claimant's depression, elsewhere in the opinion the ALJ credits Dr. Goldberg's mental

---

[11]  Claimant attempts to secure a "disabled" ruling at step three by analogizing her chronic Fatigue Syndrome to a listed disease of the human immune system, offering only the observation that "there is some evidence that Chronic Fatigue Syndrome may be a disease of the immune system."  (R. 58) (emphasis added).  That possibility, not supported by record evidence, did not require the ALJ to provide additional analysis of whether Claimant's Chronic Fatigue Syndrome is equivalent in severity to a listed impairment.

health diagnosis finding Mrs. Merritt to have "adjustment disorder with depressed mood" but noting that "should she get a job, it appears that work would be good for her if she were physically able to do it."  The ALJ's determination that Mrs. Merritt's depression is not equivalent to a listing is therefore supported by substantial evidence because the ALJ clearly found that Mrs. Merritt's mental health does not preclude her from "gainful activity," and no medical evidence in the record indicates otherwise.

In sum, this Court holds that the ALJ's reasoning at step three is sufficient because it was based on substantial evidence.

## III.   <u>CONCLUSION</u>

For the reasons stated above, this Court shall remand to the ALJ for reconsideration and explanation of (1) Claimant's Carpal Tunnel Syndrome, fibromyalgia, radiculopathy, and degenerative disc disease and their effect on Claimant's Residual Functional Capacity and (2) the weight given to Claimant's treating rheumatologist, Dr. Maurer.  Finally, assuming that the ALJ still finds that Claimant is unable to perform past relevant work, it will be necessary to redetermine whether there was work available in the economy for someone with Claimant's Residual Functional Capacity.  The accompanying Order on remand is entered.


<u>August 16, 2007</u>                    <u>s/ Jerome B. Simandle</u>
DATE                                 JEROME B. SIMANDLE
                                     U.S. DISTRICT JUDGE